## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RODNEY STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.:  2:17-cv-02153-JHE |
| AUTOMOTIVE QUALITY AND | ) | |
| LOGISTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER[1]

Plaintiff Rodney Stewart ("Stewart" or "Plaintiff") brings this employment discrimination action against Defendant Automotive Quality and Logistics, Inc. ("AQL" or "Defendant"), alleging that AQL discriminated against him because of his gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. (Doc. 1). AQL has moved for summary judgment on Stewart's sole claim. (Doc. 38). (Doc. 1). Stewart opposes the motion, (doc. 42), and AQL has filed a reply in support. (Doc. 44). The motion is fully briefed and ripe for review. For the reasons stated more fully below, AQL's motion for summary judgment is **DENIED.**

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 13).

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[2]

AQL provides containment, sorting, and inspection employees to automobile part manufacturers and suppliers across the United States.  (Doc. 40-1 at 11).  From January 2014 until June 2017, AQL employed Stewart as an at-will employee.  (Doc. 43-6 at 3).  Initially, Stewart worked as a Quality Inspector at the Faurecia facility, but was promoted to the position of Team Leader in August 2016.  (*Id*. at 14, 19).[3]  On May 25, 2017, AQL transferred Stewart to the Brose production facility, where his primary duty was the inspection of car seat rails under the supervision of Dannie Hinton ("Hinton").  (*Id*. at 13, 25).

Within Stewart's first few days at the Brose facility, Hinton made several comments referencing Stewart's gender, including: 1) "All you Niggers are hardheaded, you all don't want to do nothing.  I get all the bitches in there, they do what I tell them to do; we don't have no—no talk back or nothing;" 2) "Mens [sic] are hard to work with, all guys, period;" 3) "if I could have my way I would want all females," and; 4) "You still showing up?  Man, I thought they switched you out with a female by now."  (Doc. 40-1 at 34, 36-37; doc. 42 at 5, 6).[4]  There were no other male employees on Stewart's shift at the Brose facility.  (Doc. 40-1 at 29).

There was no time clock at the Brose facility.  (*Id.* at 30).  AQL used sign-in sheets to keep track of employees present on site for security purposes, but used separate "time sheets" to calculate pay.  (Doc. 40-3 at 12, 13).  When an employee signed in on the sign-in sheet, the

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  Any factual disputes have been resolved in Stewart's favor as the non-moving party.

[3] Over the course of his employment, Stewart worked at three AQL facilities: the Faurecia facility, the Brose facility, and the ZF Industries facility.  (Doc. 40-1 at 11).

[4] The court notes that at least one alleged comment is Stewart's own characterization of Hinton's opinion toward male employees i.e. Stewart's belief that Hinton "didn't want no guys around, period, that can come between him and his women."  (Doc. 40-1 at 38).

employee would print his or her name and note the time but leave the rest of the form blank until the end of the day.  (Doc. 40-1 at 30).  At the end of the day, the employee would put his or her signature on the sheet.  (*Id.*).  AQL employees received a thirty-minute meal period and two short breaks throughout the workday.  (Doc. 40-1 at 30–31; Doc. 40-3 at 16).  AQL permitted employees to leave the facility during meal periods, but required them to return to their positions by the time the break period ended; employees were not required to notify AQL if they chose to leave.  (Doc. 40-3 at 16).

### A. June 6, 2017 Incident

On June 6, 2017, Stewart was assigned to work the 2:00 p.m. to 10:00 p.m. shift.  (Doc. 40-1 at 25).  Stewart arrived on time and printed both his name and "2 p.m." on the sign-in sheet, as was required by AQL.  (Doc. 40-1 at 48; Doc. 43-6 at 3).   From this point forward, there is conflicting evidence as to what time Stewart left, returned to his assigned workstation, and signed out.

Taking the evidence favorably to Stewart, Stewart left his workstation around 5:00 p.m. at the start of his half-hour lunch break, and returned prior to the time his shift resumed at 5:30 p.m.  (Doc. 40-1 at 30–31).  Specifically, Stewart worked at his position until the bell rang around 5:00 p.m. for the start of the lunch break.  (Doc. 40-1 at 31).  At approximately 5:00 p.m., Stewart walked out of the plant to his car, drove to a nearby gas station, and put air in his tire because he was concerned about a "slow leak."  (Doc. 40-1 at 31).  Stewart estimates that he spent one minute putting air in the tire, but did not know if that solved the issue because he "didn't have time to just look and check and see," as he had to "hurry and get back to work before the line start[ed] back

4

up." (*Id.*).  Stewart made the five-minute drive back to work, parked, and returned to his position on the line just before 5:30 p.m.  (*Id*. at 31–32).[5]

Once work resumed at 5:30 p.m., Hinton and Shannell Young, another AQL employee, approached Stewart and asked where he had been.  (Doc. 40-1 at 32).  Hinton stated that he had looked for Stewart on two occasions between 5:00 p.m. and 5:30 p.m., but had not found him. (*Id*.).  Stewart explained that he had left during the break to put air in his tire.  (*Id*.).  Hinton and Young then walked Stewart to his car, explaining that Hinton would contact Stewart when he found out what had occurred.  (Doc. 40-1 at 33).  Stewart claims that he did not have the opportunity to enter the time he left or sign his name on the sign-in sheet.  (*Id*. at 34).[6]

On June 10, 2017, Hinton completed an Employee Incident Report.  (Doc. 40-2 at 33, 81– 82; Doc. 40-3 at 47–48).  In the report, Hinton described the event as follows:

> Rodney left for break early and returned late.  I noticed Rodney was not at work because his vehicle was not there around 5 p.m.  Myself and Shannell worked Rodney's station until he showed back up.  This was around 7:20 p.m.  Rodney did not tell anyone he would be leaving nor did he ask myself or Shannell if he could leave.  When I asked Rodney where had he been he replied his tire had a slow leak and he had to put some air in it and he also took his lunch break.  When I asked what time he had left his reply was he left at 6:15 p.m.  He said he left late for lunch. and that is why he was late getting back.  When me and Shannell told [sic] we had been working his station since he left he had nothing else to say.  Rodney also signed himself out of the sign-in book at 10 p.m.

(*Id*. at 81–82).  Hinton selected "Final warning" and "Suspension."  (*Id*.).

---

[5] AQL claims that Stewart left his workstation at some point before 5:00 p.m. and did not return until 7:20 p.m.  (Doc. 40-2 at 36; Doc. 43-6 at 10).

[6] Hinton's account is that he received a call before 5:00 p.m. from an employee informing him that no one was at Stewart's workstation.  (Doc. 40-2 at 32, 34).  Hinton claims he then noticed that Stewart's car was no longer in the parking lot, forcing Hinton and Young to work at Stewart's workstation until Stewart returned around 7:20pm.  (Doc. 40-2 at 34–35).  Upon Stewart's return, Hinton says he told Stewart that he was going to suspend him, and that Hinton and Young walked Stewart to his car.  (*Id*. at 32).

### B. Investigation

On June 7, 2017, Brian M. Rinness ("Rinness"), a Human Resource Lead with AQL, was notified of the incident and began to conduct a remote investigation from his office in Michigan. (Doc. 40-3 at 4–5, 10). In addition to reviewing the incident report, Rinness claims to have interviewed Hinton on two occasions. (Doc. 40-3 at 8–9). Hinton, however, does not recall talking with Rinness.[7] (Doc. 40-2 at 36). According to Rinness, Young told him that Stewart left the facility before 5:00 p.m., someone asked where he was, and that she and Hinton worked in Stewart's workstation until he returned around 7:00 p.m. (Doc. 40-3 at 10).

The parties dispute the nature and frequency with which Rinness spoke to Stewart. According to Rinness, he spoke with Stewart a few times during the week of the incident. (Doc. 40-3 at 6). Stewart claims he first spoke to Rinness approximately three and a half weeks after the incident. (Doc. 40-1 at 44). Rinness testified that Stewart informed him that he left the job site early for lunch, put air in his tire, and then returned to work late. (Doc. 40-3 at 6, 17). Stewart alleges Rinness did not ask him where he went or how long he had been gone, but rather informed Stewart of his understanding that Stewart's job abandonment qualified as a ground for termination. (Doc. 40-1 at 44). Moreover, Rinness stated, "I'm not there to see what goes on. I can only go off what my people tell me. So . . . I'm going to have to follow their lead on this." (*Id*.; Doc. 42 at 11).

### C. Termination

On June 19, 2017, Rinness sent Stewart a letter informing him of the results of the investigation. (Doc. 40-1 at 113). The letter explained that Rinness ultimately made the decision

---

[7] In his report, Rinness stated that Hinton sent Stewart home at 5:00 p.m., although Hinton reports he sent Stewart home around 7:20 p.m. (Doc. 40-2 at 36; Doc. 43-6).

to terminate Stewart effective June 12, 2017, citing (1) job abandonment and (2) falsification of records as grounds for termination.  (*Id.*).

In concluding that Stewart abandoned his job for two hours, Rinness relied on both (1) information gained from Stewart's June 6 time sheet indicating that he left at 5:00 p.m., and (2) Hinton's statement that Stewart returned after 7:00 p.m.  (Doc. 40-3 at 22).[8]  It was not until his deposition that Rinness realized that Hinton had been filling out the time sheets for his employees, even though each individual employee was required to fill out their own time sheets.  (Doc. 40-3 at 16, 41–46).

In concluding that Stewart falsified AQL records, Rinness cited the discrepancies with respect to time on both the time and sign-in sheets.  (Doc. 40-3 at 50–51, 61).  Specifically, Rinness noted the time sheet indicated that Stewart was sent home at 5:00 p.m.,[9] but signed out of the sign-in sheet at 10:00 p.m.  (Doc. 40-3 at 50; *see also id.* at 59–60).

Stewart filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which issued a right to sue letter.  (Doc. 1 at 2).  This lawsuit timely followed.  (Doc. 1).

### III. Discussion

For the reasons explained below, the undersigned concludes that AQL is not entitled to summary judgment on Stewart's gender discrimination claim.  The record is rife with genuine issues of material fact which a jury must resolve.[10]

---

[8] Rinness also alleges Stewart "admitted that he left and was gone for . . . probably more than a half hour," although did not specify two hours.  (Doc. 40-3 at 22).

[9] Hinton notes that Rinness' finding that Stewart was sent home at 5:00 p.m. is inaccurate. (Doc. 40-2 at 36).

[10] Stewart attempts to travel both a single-motive and a mixed-motive route to a jury trial. Because Stewart has presented sufficient evidence to survive summary judgment on a single-motive theory, the undersigned need not address the mixed-motive theory.

Stewart argues that he has presented sufficient circumstantial evidence to create an inference of gender discrimination.  (Doc. 42 at 13).  The undersigned agrees.  In Title VII cases lacking any direct evidence of discrimination, such as this case, "[a] plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence." *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (citation and quotation marks omitted).[11]  A plaintiff may show a "convincing mosaic" through evidence that falls into any of a number of broad categories, such as "(1) suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation and internal quotation marks omitted).  "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers v. Troup Cty., Ga., Sch. Dist*., 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith*, 644 F.3d at 1328).  Whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

---

[11] While courts typically evaluate these claims by applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), this court does not apply such framework because Stewart "does not rely on establishing a traditional 'replacement' prima facie case."  (Doc. 42 at 13).  *See also Vessels v. Atlanta Indep. Sch. Sys*., 408 F.3d 763, 768 n.3 (11th Cir. 2005) (noting that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence.").

*Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quotation omitted).

Here, Stewart has presented an evidentiary mosaic from which a reasonable jury could infer that he was terminated based on his gender, including evidence of (1) the nature and timing of Hinton's biased comments; (2) evidence suggesting that Hinton submitted a false report to the decision-maker; and (3) evidence that the decision-maker was a mere "cat's paw" for Hinton's discriminatory animus. (Doc. 42 at 12–15, 17–20).

### A. Hinton's Comments

Stewart argues that multiple comments are probative of Hinton's gender bias. (Doc. 42 at 15). These comments include: 1) "You still showing up? Man, I thought they switched you out with a female by now;" 2) "Men are hard to work with, all guys, period;" 3) "[If] I could have my way I would want all females" and; 4) "All you Niggers are hardheaded, you all don't want to do nothing. I get all the bitches in there, they do what I tell them to do; we don't have no -- no talk back or nothing. Just hardheaded, too hard to work with. I can't deal with you." (Doc. 40-1 at 34, 36–37; Doc. 42 at 5, 6). The undersigned agrees.

While AQL argues that Hinton's comments, standing alone, cannot constitute sufficient circumstantial evidence to establish a prima facie case of discrimination (doc. 44 at 3, 7), the proper inquiry is whether the comments, "when read in conjunction with the entire record," are circumstantial evidence of a discriminatory attitude. [12]  *See Ross v. Rhodes Furniture*, 146 F.3d

---

[12] Stewart cites *Mora v. Jackson Memorial Health Foundation*, 597 F.3d 1201, 1203 (11th Cir. 2010), and *Damon v. Fleming Supermarkets of Fla., Inc*, 196 F.3d 1354, 1358–59 (11th Cir. 1999), for the proposition that a single statement that goes directly to the issue of a supervisor's discriminatory intent is sufficient to create a triable issue of fact. (Doc. 42 at 15–16). While this may be a correct statement of the law, the court need not decide whether Hinton's comments, standing alone, create a triable issue of fact because other Rule 56 evidence is sufficient to create a triable issue of fact on Stewart's claim.

9

1286, 1292 (11th Cir. 1998) (noting that discriminatory comments, although not direct evidence of discrimination, may provide circumstantial evidence that, when read in conjunction with the entire record, show a decisionmaker's discriminatory attitude).  A review of the entire record reveals that Hinton's comments occurred between the time Stewart was assigned to the Brose facility on May 25, and the date of his suspension on June 6.  (Doc. 40-1 at 34, 36–38).  A reasonable juror could conclude that the comments, coupled with the close temporal proximity to Stewart's suspension, support that the suspension (and, as discussed below, Stewart's ultimate termination) was a product of Hinton's discriminatory attitude against males.  *See Lewis*, 934 F.3d at 1185.

### B. Hinton's Report Following the Incident

Stewart also argues that a reasonable jury could find Hinton's report that Stewart violated work rules pretextual on account of its falsity.  When an employer contends an employee was disciplined for violating a work rule, "the 'work rule' defense is arguably pretextual when a plaintiff submits evidence . . . that [he] did not violate the cited work rule," *Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  As the Supreme Court has noted, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000).  In this case, there is sufficient evidence to support Stewart's version of events: that he did not violate the rule, and that the report was false and a pretext for discrimination.

First, the undersigned notes that Hinton offered a materially different account of the incident than Stewart.  In the report, Hinton claimed that Stewart left just prior to 5:00 p.m. and

did not return until 7:20 p.m., while Stewart maintained that he left the facility around 5:00 p.m. at the start of the permitted half-hour lunch break and returned around 5:30 p.m. (Doc. 40-2 at 36; Doc. 40-1 at 30–31). Moreover, Hinton claimed that Stewart falsified records when he "signed himself out of the sign-in book at 10pm." (Doc. 40-2 at 82). Stewart disputes this. While Stewart states that he did print his name on the sign-in sheet, as well as write "2pm" for the "In" column, Stewart argues that he did not write "10pm" for the "Out" column. (Doc. 40-1 at 48). Stewart further argues that he did not sign his name to the immediate right of the "10pm" column, as was required by AQL at the end of the day, because he "didn't get a chance to" once Hinton walked him to his car. (*Id*. at 47–48). When asked how his signature appeared on the sign-in sheet, Stewart provided that he had "no idea," but offered that Hinton "always had the sign-out sheets." (*Id*. at 38, 48).

The factual accuracy of Hinton's report merges with the ultimate question of truthfulness; because "[t]he Court "may not weigh conflicting evidence or make credibility determinations," a jury must decide which account to believe.[13] *See, e.g., Damon*, 196 F.3d at 1366–67 (holding that Plaintiff's denial that he violated a work rule, in contrast with the decisionmaker's testimony, "create[d] a genuine issue of material fact . . ."). *See also Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Hinton's alleged comments, coupled with evidence that Hinton submitted a false report that led to Stewart's termination, create a triable issue concerning Hinton's discriminatory intent.

---

[13] AQL argues at various points that Young corroborated Hinton's account of the incident. (Doc. 44 at 13). Whether Young corroborates Hinton's account presents yet another factual dispute. That she and Hinton worked at Stewart's station until he returned at 7:20 p.m. is Hinton's own testimony. (Doc. 40-2 at 34–35). Stewart agrees that Young also walked him to his car, but at approximately 6:00 p.m. (Doc 40-1 at 33–34).

### C. Cat's Paw Theory

The inquiry does not end there.  In order to defeat summary judgment, a plaintiff must produce "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the <u>decisionmaker</u>."  *Smith*., 644 F.3d at 1328 (emphasis added).  It is undisputed that Rinness made the ultimate decision to terminate Stewart.  In other words, rather than simply showing Hinton's animus towards men, Stewart must show that Rinness' decision was tainted by discriminatory intent.

Stewart argues that Hinton's discriminatory animus may be imputed to Rinness under a "cat's paw" theory.  (Doc. 42 at 12).  A "cat's paw" theory of recovery applies where a plaintiff shows that the decisionmaker followed a biased recommendation without independently investigating a complaint against the employee.  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999).  In such a case, the recommender is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus.  *Stimpson*, 186 F.3d at 1132.  Under this theory, if the decision-making party followed the biased recommendation without independently investigating the complaint—essentially acting as a rubber stamp of the biased recommendation—then the recommender's discriminatory animus is imputed to the decisionmaker.  *Id*. at 1331–32.  If, however, a decisionmaker conducts his own evaluation and makes an independent decision, the decision is free of the taint of a biased subordinate employee.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270–71 (11th Cir. 2001).  S*ee also Crawford v. Carroll,* 529 F.3d 961, 979 n.21 (11th Cir. 2008).

AQL argues that Rinness is not a "cat's paw" for Hinton's discriminatory animus because Rinness conducted an independent investigation into whether Stewart (1) abandoned his job, and (2) falsified AQL records.  (Doc. 44 at 11).  The undersigned easily concludes that there are

genuine issues of material fact as to whether Rinness conducted the independent investigation AQL claims.

First, there are disputes as to the extent of Rinness' communication with witnesses to the incident and the content of those communications.  The parties dispute whether Rinness spoke to Hinton about the incident at all.  (*Compare* doc. 40-3 at 8–9 *with* doc. 40-2 at 36).  The parties also dispute the extent of Rinness' communications with Stewart, with Stewart alleging that he contacted Rinness three weeks after the incident and Rinness alleging that he spoke to Stewart "a few times" the week of the incident.  (Doc. 40-1 at 44; Doc. 40-3 at 5).  The parties further dispute the nature of these communications; construing the facts in Stewart's favor, a jury could conclude that Rinness merely informed Stewart that he was terminated, rather than affording Stewart an opportunity to discuss his version of events.  (Doc. 40-1 at 44).

Second, Rinness's own undisputed testimony undermines the independence of his investigation.  Rinness did not learn until his deposition that Hinton filled out Stewart's time sheet, in violation of AQL policy—in other words, that he was factually incorrect about whether Stewart falsified records.  Moreover, a jury could conclude that Rinness "essentially act[ed] as a rubber stamp" of Hinton's findings based on Rinness' statement: "I'm not there to see what goes on. I can only go off what my people tell me. So . . . I'm going to have to follow their lead on this."  (Doc. 40-1 at 44).  *See also Stimpson*, 186 F.3d at 1332.

AQL next argues that this is not a cat's paw case because Hinton did not make a recommendation to terminate Stewart.  (Doc. 44 at 12).  However, the evidence is undisputed that Hinton marked "Suspension"—an adverse employment action, *see Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1268 (11th Cir. 2010)—as the action to be taken on the incident

report sent to Rinness.  (Doc. 40-2 at 81–82).  AQL acknowledges this is undisputed.[14]  (Doc. 44 at 12).  The cat's paw theory imputes <u>animus</u> up the chain.  It does not preclude a finding that Rinness acted as the vessel for Hinton's discriminatory intent that Hinton recommended one adverse action, only for Rinness to impose another, more severe adverse action.  *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S. Ct. 1186, 1194, 179 L. Ed. 2d 144 (2011) (holding, in the context of the "very similar to Title VII" Uniform Services Employment and Reemployment Rights Act, that "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .") (emphasis in original).[15]  *See also King v. Volunteers of Am., N. Alabama, Inc.*, 502 F. App'x 823, 828 (11th Cir. 2012) (relying on *Staub* in Title VII case to impute a supervisor's animus in writing reprimands to the decisionmaker ultimately responsible for terminating the plaintiff).  Nor does it say anything about the thoroughness of Rinness's investigation.  Regardless of whether Rinness imposed a harsher punishment, a jury could reasonably conclude that Rinness failed to conduct an independent

---

[14] AQL minimizes this by stating Hinton "effectively recommended that Plaintiff not be terminated," (doc. 44 at 12), but it is not reasonable to characterize a recommendation that an employee be disciplined in one way as a recommendation that the employee not be disciplined in other ways.

[15] AQL disputes that *Staub* applies here.  (Doc. 44 at 12).  To support this, it cites *Duncan v. Alabama*, an unpublished decision in which the Eleventh Circuit stated *Staub* "did not directly overrule precedent applying the [cat's paw] theory in the context of other statutes."  734 F. App'x 637, 639 (11th Cir. 2018).  This is true, but the Eleventh Circuit found the result would not change whether or not it applied *Staub* because "the undisputed evidence in the record indicates that any alleged bias was not the proximate cause" of the adverse employment action.  *Id.* at 640.  That is not the case here.  In any event, at a minimum *Staub* provides a persuasive reason to conclude that what matters here is the intent to cause an adverse employment action, not that the ultimate action is identical to the one sought.

investigation, but instead relied on Hinton's recommendation that an adverse action be taken against Stewart in deciding to terminate Stewart.[16]

Viewing the record in a light most favorable to Stewart, Stewart has presented sufficient circumstantial evidence to support his gender discrimination claim.

## IV. Conclusion

For the reasons stated above, Stewart has presented evidence sufficient to withstand AQL's motion for summary judgment.  AQL's motion for summary judgment, (doc. 19), is **DENIED**.

The parties are encouraged to discuss alternative dispute resolution, including the potential for mediation. The parties are **ORDERED** to file a joint status report by **November 17, 2020**, regarding the status of such discussions and whether they believe mediation would be beneficial to the resolution of the remaining claim (including a timeframe if they intend to pursue mediation).

DONE this 3rd day of November, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[16] Because there is sufficient evidence to support the cat's paw theory, AQL's argument that Stewart cannot show his firing was pretextual based on Rinness's view of the situation, (*see* doc. Doc. 44 at 7-11), is beside the point.  What matters is Hinton's view of the situation, and a jury must resolve the factual questions identified above as to that.  *See supra*, Sections III.A. and III.B.

15